## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A CRIMINAL COMPLAINT

I, Kevin McCusker, being duly sworn, hereby depose and state as follows:

1.      I am a Special Agent for the Federal Bureau of Investigation ("FBI") currently assigned to the Boston, Massachusetts Field Office. I have been employed as a Special Agent for over twelve years. Since August 2011, I have been assigned to a squad within the Boston Field Office that investigates Complex Economic Crimes. Prior to this assignment, I investigated matters concerning National Security in the Minneapolis and Boston Field Offices. I hold a bachelor's degree in Accounting and an inactive Certified Public Accountant license. As an FBI Special Agent, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2.      I make this affidavit in support of criminal complaints charging DONNA M. ACKERLY ("ACKERLY"), CHARLES W. GARSKE, also known as "Chuck Garske" ("GARSKE"), RICHARD J. GOTTCENT ("GOTTCENT"), KEITH HAYNES ("HAYNES") and MICHAEL SEDLAK ("SEDLAK"), with conspiracy to commit wire fraud and honest services wire fraud, in violation of Title 18, United States Code, Section 371. Specifically, as set forth below, I have probable cause to believe that in or about and between September 2007 and March 2012, ACKERLY, GARSKE, GOTTCENT, HAYNES and SEDLAK, together with others known and unknown, conspired (1) to defraud a prominent Proxy Advisory Firm of its right to the honest and faithful services of its employee, Brian M. Bennett, also known as Brian M. Zentmyer ("Bennett"), by bribing Bennett with things of value, including tickets to concerts and sporting events, in order to obtain from him confidential information about the Proxy Advisory Firm's clients that he obtained in the course of his employment, including information

1

about whether and how those clients had voted on particular shareholder proposals; and (2) to defraud the clients of their own employer, a prominent Proxy Solicitation Firm, by billing them for some of the bribes provided to Bennett while falsely representing those bribes to be legitimate expenses of the Proxy Solicitation Firm.

3.     The facts in this affidavit come from my personal involvement with this investigation, interviews with witnesses, and my review of documents, records, and information provided by others, including the Securities and Exchange Commission ("SEC"). In submitting this affidavit, I have not included each and every fact known to me about this investigation. Rather, I have included only those facts that I believe are sufficient to establish probable cause.

## Certain Relevant Persons and Entities

4.     The Proxy Advisory Firm is one of the leading proxy advisory firms in the United States, with offices in Boston, New York and elsewhere.

5.     The Proxy Solicitation Firm is one of the leading proxy solicitation firms in the United States, with offices in New York and elsewhere, and back-office operations in Canton, Massachusetts, where its email servers were located.

6.     ACKERLY, a resident of Hopewell, New Jersey, was employed by the Proxy Solicitation Firm from in or about and between May 1980 and the present. As a senior managing director based in New York, ACKERLY, among other things, advised the firm's publicly traded clients on matters requiring shareholder approval.

7.     GARSKE, a resident of Wayne, New Jersey, was employed by the Proxy Solicitation Firm from in or about and between November 1991 and October 28, 2011. Like ACKERLY, GARSKE was a senior managing director, based in New York, responsible, among

other things, for advising the firm's publicly traded clients on matters requiring shareholder approval.

8.      GOTTCENT, a resident of Islip Terrace, New York, was employed by the Proxy Solicitation Firm from in or about and between February 2000 and the present.  GOTTCENT worked as a senior managing director in the firm's Institutional Services Group ("ISG"), based in New York.  Among other things, the ISG was responsible for conducting research into shareholder votes affecting the Proxy Solicitation Firm's clients.

9.      HAYNES, a resident of New York, New York, was employed by the Proxy Solicitation Firm from in or about and between January 1995 and June 16, 2016, when his employment was terminated.  Like ACKERLY and GARSKE, HAYNES was based in New York and was responsible, among other things, for advising the firm's publicly traded clients on matters requiring shareholder approval.

10.      SEDLAK, a resident of Allentown, Pennsylvania, was employed by the Proxy Solicitation Firm from in or about and between May 1999 and June 11, 2012, when his employment was terminated.  As a member of the firm's ISG, based in New York, SEDLAK was responsible for conducting research into shareholder votes affecting the firm's clients.  For a portion of the time he worked at the Proxy Solicitation Firm, SEDLAK reported to GOTTCENT.

11.      Bennett was employed from in or about and between July 1998 and March 2012 in various positions at the Proxy Advisory Firm.  From in or about and between 1998 and 2010, Bennett worked in the Proxy Advisory Firm's Rockville, Maryland office.  From in or about and between 2010 and March 26, 2012, when his employment was terminated, Bennett worked in the Proxy Advisory Firm's Boston office.

**General Background on Proxy Advisors and Proxy Solicitors**

12.     Institutional investors often own shares in many different publicly traded companies (or "issuers") and, as a result, are called upon to vote on numerous shareholder proposals each year—including, for example, proposals relating to the election of directors, executive compensation, and mergers and acquisitions.  Shareholder proposals are typically described in an issuer's proxy materials, and votes must be cast at or before the issuer's annual shareholder meeting.

13.     Many institutional investors retain proxy advisory firms to provide them with research, analysis and recommendations concerning shareholder proposals.  Proxy advisory firms may also engage in ancillary businesses, including helping their clients actually cast their votes.

14.     Proxy solicitation firms assist publicly traded companies in matters requiring shareholder approval by attempting to gather information about institutional investors' holdings, and the direction of their proxy votes, even as the votes are being cast (and, on occasion, after the votes are cast but before they are made public).  This information is valuable, among other reasons, because it provides proxy solicitors, and their clients, with early insight into whether particular shareholder proposals are likely to pass or fail, and can thus help to shape their strategies for affecting the outcome of shareholder votes.

15.     There are a number of legitimate ways in which proxy solicitation firms may attempt to determine the direction of votes by particular institutional investors.  For example, they can contact the institutional investors directly and ask whether and how they have voted on particular proposals.  Some institutional investors will share such information with proxy solicitors, but some will not.  Alternatively, proxy solicitors can attempt to piece such information together by, for example, comparing the number of votes cast with an institutional

4

investor's public filings that may disclose how many shares the investor holds in a particular issuer. This method, however, is both imperfect and time-consuming, and the number of shares an institutional investor holds in a particular issuer is not always publicly available.

## Background of the Conspiracy

16.     In the course of his work for the Proxy Advisory Firm, Bennett had access to nonpublic information concerning the Proxy Advisory Firm's clients. The information included how many shares the clients held in particular issuers, whether the clients had voted on particular shareholder proposals, and if so, how they had voted.

17.     The Proxy Advisory Firm's contracts with its clients typically included provisions requiring that the Proxy Advisory Firm not disclose this type of confidential client information to third parties. Accordingly, disclosure of the confidential client information to third parties in breach of the Proxy Advisory Firm's contractual obligations could, among other things, jeopardize the Proxy Advisory Firm's business and its relationships with its clients.

18.     The Proxy Advisory Firm took steps to protect this confidential client information, which was itself confidential to the Proxy Advisory Firm.

19.     Among other things, Bennett was subject to the Proxy Advisory Firm's code of conduct, which prohibited employees from (1) accessing confidential information about the Proxy Advisory Firm's clients unless necessary to perform their job responsibilities; (2) providing confidential client information to third parties; and (3) accepting gifts or entertainment "that appears designed to induce an employee to act in a manner inconsistent with the best interests of [the Proxy Advisory Firm]."

5

### The Conspiracy

20.     In or about and between September 2007 and March 2012, in the District of

Massachusetts and elsewhere, the defendants, ACKERLY, GARSKE, GOTTCENT, HAYNES

and SEDLAK, together with others known and unknown, agreed to provide Bennett with things

of value—including tickets to concerts and sporting events—in order to obtain from Bennett the

Proxy Advisory Firm's confidential client information, including information about whether and

how the Proxy Advisory Firm's clients had voted on particular shareholder proposals, in

violation of Bennett's duties to his employer.

21.     The defendants, ACKERLY, GARSKE, GOTTCENT, HAYNES and SEDLAK,

together with others known and unknown, also conspired to defraud clients of the Proxy

Solicitation Firm by billing those clients for at least a portion of the cost of the  bribes provided

to Bennett, while falsely describing those charges as legitimate expenses of the Proxy

Solicitation Firm that were properly passed on to the clients.

### Objects of the Conspiracy

22.     A primary purpose and object of the conspiracy was for the Proxy Solicitation

Firm to make money and gain an illicit business advantage by corruptly obtaining nonpublic

information about the voting practices of the Proxy Advisory Firm's clients, which information

the defendants used to advise their clients on matters requiring shareholder approval.

23.     Another purpose and object of the conspiracy was to limit the costs of the bribery

scheme to the Proxy Solicitation Firm by misleading the firm's clients into paying at least part of

the costs of the bribes paid to Bennett.

6

### Means and Methods of the Conspiracy

24.     Among the means and methods by which the defendants, ACKERLY, GARSKE, GOTTCENT, HAYNES and SEDLAK, together with others known and unknown, carried out the conspiracy were the following:

    a.  ACKERLY, GARSKE, GOTTCENT and HAYNES, and other known and unknown employees of the Proxy Solicitation Firm, directed SEDLAK to obtain information about how various institutions had voted on particular shareholder proposals.  In some instances, SEDLAK was specifically directed to obtain the information from his contact at the Proxy Advisory Firm.

    b.  SEDLAK requested that Bennett provide him with confidential information about whether and how certain clients of the Proxy Advisory Firm had voted on the shareholder proposals.

    c.  In response to SEDLAK's requests, Bennett accessed the Proxy Advisory Firm's computer systems, often after-hours, to obtain the confidential, client-specific information SEDLAK sought.  Bennett then provided that information to SEDLAK—typically via emails in interstate commerce—in violation of his duties to the Proxy Advisory Firm and its clients.

    d.  In an effort to conceal the fraud scheme from the Proxy Advisory Firm, Bennett typically communicated with SEDLAK using Bennett's personal email address and occasionally via text message.  SEDLAK, who had no need to hide his actions from his colleagues and superiors at the Proxy Solicitation Firm, typically communicated with Bennett from his corporate email address.

e. SEDLAK forwarded the confidential information he obtained from Bennett to other employees of the Proxy Solicitation Firm, including ACKERLY, GARSKE, GOTTCENT and HAYNES.  ACKERLY, GARSKE and HAYNES then provided it to the firm's clients.

f. SEDLAK kept his co-conspirators informed about the fact that he was obtaining the confidential client voting information from his "guy" at the Proxy Advisory Firm.  When SEDLAK forwarded specific voting information he received from Bennett to ACKERLY, GARSKE, GOTTCENT and HAYNES, he often noted in the email that he had obtained the information from the Proxy Advisory Firm.

g. In exchange for the confidential information Bennett provided, SEDLAK gave Bennett tickets to concerts and sporting events in Massachusetts and elsewhere.

h. SEDLAK accounted for the bribes in expense reports he submitted to GOTTCENT and others at the Proxy Solicitation Firm, who approved them.  In several instances, SEDLAK sought and received permission from ACKERLY, GARSKE and HAYNES to bill at least a portion of the cost of the bribes to clients of the Proxy Solicitation Firm.  In those instances, ACKERLY, GARSKE and HAYNES provided SEDLAK with the names of clients to bill, and instructed the Proxy Solicitation Firm's billing department to falsely describe those charges in client invoices as "courier services" or other legitimate-sounding expenses. The unwitting clients selected to receive falsified invoices were not always beneficiaries of the confidential information the defendants obtained by bribing Bennett.

i. ACKERLY, GARSKE and HAYNES reviewed, edited and approved the falsified invoices, which were submitted to the Proxy Solicitation Firm's clients for payment.

### Overt Acts

25. On or about various dates between approximately September 2007 and March 2012, in the District of Massachusetts and elsewhere, the defendants undertook the following overt acts, among others, in furtherance of the conspiracy:

26. SEDLAK repeatedly obtained confidential information from Bennett about whether and how specific clients of the Proxy Advisory Firm had voted in particular shareholder contests. SEDLAK shared the confidential information he obtained from Bennett with other employees of the Proxy Solicitation Firm, including ACKERLY, GARSKE, GOTTCENT and HAYNES.

27. In order to induce Bennett to provide the confidential information, SEDLAK provided Bennett with things of value, including tickets to concerts and sporting events.

28. For example, in the month of October 2010 alone, SEDLAK requested and Bennett provided information on shareholder votes by dozens of clients of the Proxy Advisory Firm.

29. Thereafter, on October 25, 2010, SEDLAK purchased two tickets for Bennett to attend a basketball game the following day between the Miami Heat and the Boston Celtics at TD Garden in Boston. The cost of the tickets exceeded $1,400.

30. SEDLAK's expense report accounting for the Heat-Celtics tickets was approved by GOTTCENT and the chief operating officer of the Proxy Solicitation Firm. At the instruction of ACKERLY, GARSKE and HAYNES, the cost of the tickets was divided among three clients

of the firm—a New Jersey-based medical devices and pharmaceutical company, an Idaho-based radiology services company, and a Minnesota-based multinational conglomerate—and billed to those clients in or about and between December 2010 and March 2011 as purported "courier services," with an added markup.

31.     Similarly, in the month of April 2011, SEDLAK requested and Bennett provided specific information on votes on more than 20 individual shareholder proposals by dozens more clients of the Proxy Advisory Firm.

32.     Thereafter, on April 29, 2011, SEDLAK purchased two tickets for Bennett to attend a May 1, 2011 baseball game between the Seattle Mariners and the Boston Red Sox at Fenway Park, in Boston.

33.     The nearly $700 cost of the tickets was billed, in or about June 2011, to GARSKE's client, a Georgia-based producer of packaged bakery foods as purported "courier services," and included a 20 percent markup.

34.     On multiple other occasions, SEDLAK requested, and Bennett provided, confidential information concerning specific shareholder votes by clients of the Proxy Advisory Firm.  SEDLAK thereafter provided that information to other employees of the Proxy Solicitation Firm, including ACKERLY, GARSKE, GOTTCENT and HAYNES, and in multiple instances obtained their assistance in either expensing the cost of the bribes to the Proxy Solicitation Firm itself, or billing its clients for the bribes under false pretenses.  For example:

*The California Semiconductor Manufacturer*

35.     On or about February 13, 2008—one week before the annual shareholder meeting of a California-based semiconductor manufacturer ("the California semiconductor manufacturer")—SEDLAK sent an email from his email account at the Proxy Solicitation Firm

10

to Bennett's personal email account inquiring about a shareholder vote on a proposed

performance incentive plan for the California semiconductor manufacturer's directors and key

employees.  SEDLAK requested the "status of" voting by 14 institutional investors, including:

"if voted—how & how many shares—if not—how many shares."

36.     Bennett responded on or about the following day by providing information about

13 of the 14 shareholders, who were clients of the Proxy Advisory Firm, including how many

shares of the California semiconductor manufacturer they owned, whether they had voted on the

proposed performance incentive plan, and if so, how they had voted.

37.     SEDLAK forwarded the confidential voting information to three employees of the

Proxy Solicitation Firm, including GOTTCENT.  In the subject line of the email, SEDLAK

listed the name of the California semiconductor manufacturer along with the name of the Proxy

Advisory Firm.

38.     One week later—on the day of the shareholder vote—SEDLAK sent an email

from his email account at the Proxy Solicitation Firm to Bennett's personal email account,

inquiring: "I just love asking questions like this: opening day—3/30—2 or 4 tickets?"  Bennett

responded: "2 tickets is good...."

39.     On or about March 26, 2008, SEDLAK sent an email to GOTTCENT in which he

indicated that he had spoken to the Proxy Solicitation Firm's President and its Chief Operating

Officer "about a ticket request for" the Proxy Advisory Firm.  SEDLAK continued:

> Mentioned that he wants 2 tickets for opening day of the Nationals
> game which he gets every year.  Looked at on-line ticket brokers
> and the cheapest that I came across through ticket liquidators is
> approx. $400-450 a ticket.  I told him that the request is
> substantiated because of the large volume of requests that he does
> respond to.  Told [the Chief Operating Officer] that I will order
> them today. [I] also told [the Chief Operating Officer] I spoke to
> Donna [ACKERLY] & Chuck [GARSKE] and they are able to bill

$500 each for clients. Donna said I can bill $500 to [a Florida-based home builder] when I get my statement. Are you fine with me putting it on my card?

40.     GOTTCENT responded: "If [the Chief Operating Officer] is OK with it, so am I."

41.     On or about the same day, SEDLAK purchased two tickets to an Opening Day Major League Baseball game between the Atlanta Braves and the Washington Nationals, at Nationals Park, in Washington, D.C., at a cost of more than $1,000.

42.     On or about March 30, 2008, Bennett attended the Braves-Nationals game using the tickets given to him by SEDLAK.

43.     SEDLAK filed an expense report for the tickets, listing the expense as "tickets for Brian Zentmyer" and identifying the division of the Proxy Advisory Firm where Bennett—who was then known as Zentmyer—worked. The expense report indicated that the cost of the tickets was to be split between the Florida-based home builder that was ACKERLY's client and a Texas-based manufacturer of electrical products that was GARSKE's client. The expense report was approved by the president of the Proxy Solicitation Firm.

44.     In or about April 2008, ACKERLY received from the Proxy Solicitation Firm's billing department a copy of a draft invoice to the Florida-based home builder, which included a charge of more than $5,000 for "travel expenses." ACKERLY requested that the billing department provide a breakdown of the travel expenses, which she indicated "seem high." In response, ACKERLY received a list of expenses indicating that the purported travel charge included $515, plus a markup, for a SEDLAK expense for "tickets for Brian." ACKERLY edited the invoice, but did not alter the travel expense line, and approved it for submission to the client.

12

45.     Similarly, in or about April 2008, GARSKE received from the Proxy Solicitation Firm's billing department a copy of a draft invoice to the Texas-based manufacturer of electrical products, which reflected a charge of $592.25 for "M. Sedlak – Great Tickets." The charge included $515 for half the cost of the tickets given to Bennett, plus a 15 percent markup.

46.     The final bill sent to the Texas-based manufacturer of electrical products did not include the ticket charge. Instead, a portion of the charge appeared on a bill submitted to another GARSKE client.

*The California-Based Entertainment Company*

47.     On or about and between January 12, 2009 and January 28, 2009, SEDLAK sent a series of emails from his email account at the Proxy Solicitation Firm to Bennett's personal email account, listing numerous institutional investors and inquiring about how many shares of a large, California-based entertainment company ("the California-based entertainment company"), each of the investors owned.

48.     In a series of responses, Bennett provided information concerning the number of shares each of the institutional investors, who were clients of the Proxy Advisory Firm, held in the California-based entertainment company. Bennett objected to the size of SEDLAK's request, however, stating: "what do you want every f-----g holder. [D]on't even try to ask me for votes on all of these." SEDLAK responded that the Proxy Solicitation Firm was "competing with someone on this job," later adding: "We have to do whatever we can [because the California-based entertainment company] is a big company and we don't want to lose them as a client."

49.     SEDLAK forwarded the shareholder information that he received from Bennett to ACKERLY and GOTTCENT. In the subject line of the emails, SEDLAK indicated that he had obtained the information from the Proxy Advisory Firm.

50.     On or about February 20, 2009, Bennett requested that SEDLAK provide him

with tickets for a basketball game the following evening between the University of North

Carolina Tar Heels and the University of Maryland Terrapins, in College Park, Maryland.

Thereafter, SEDLAK emailed the Chief Operating Officer of the Proxy Solicitation Firm as

follows:

> Hi [Chief Operating Officer]. Brian at [the Proxy Advisory Firm]
> asked me to get him tickets for a college basketball game, MD vs.
> NC. for 2/21. I checked Stubhub and TicketsNow. The cheapest
> good seat I could find was a pair going for $166 each, Sect. 101
> row 8. I wanted to make sure you were okay with that. I want to
> purchase the tickets in the next 30 minutes if I could so that they
> do not disappear. Thanks.

51.     On or about the same date, SEDLAK purchased the tickets for Bennett and

forwarded the order confirmation from SEDLAK's email at the Proxy Solicitation Firm to

Bennett's personal email.

52.     On or about March 20, 2009, SEDLAK emailed Bennett a list of 12 investors in

the California-based entertainment company and requested information about how they had

voted on three specific shareholder proposals at the company's annual meeting, held ten days

earlier.  Bennett responded by providing confidential information about how 11 of the

investors—who were clients of the Proxy Advisory Firm—had voted on the shareholder

proposals.

53.     SEDLAK forwarded the confidential voting information that he received from

Bennett to ACKERLY, GOTTCENT and the chairman of the Proxy Solicitation Firm.  In the

subject line of the email, SEDLAK indicated that it contained "[Proxy Advisory Firm] info."

*The Wisconsin-Based Industrial Conglomerate*

54.     On or about January 11, 2010—two weeks before the annual shareholder meeting of a large, Wisconsin-based industrial conglomerate ("the Wisconsin-based conglomerate")—SEDLAK received a request from another employee of the Proxy Solicitation Firm requesting that he obtain voting information from the Proxy Advisory Firm concerning the upcoming proxy vote.

55.     On each of the following two days, SEDLAK sent an email from his email account at the Proxy Solicitation Firm to Bennett's personal email account inquiring about a pending shareholder proposal that the Wisconsin-based conglomerate's directors be elected by a majority, rather than a simple plurality, of shareholders. The email requested "how many & how voted" and listed 20 of the conglomerate's largest institutional investors.

56.     Bennett resisted the request, noting that because of changes in the Proxy Advisory Firm's systems and his own role, "[I] don't have the same access to check things." SEDLAK persisted. Among other things, SEDLAK noted: "This may be a challenging proxy season and I have to get used to which ones you could see [because] everyone is used to you seeing everything in the system. . . . If I want the Boston visits, I also have to continue hyping you." SEDLAK added that he could not obtain the information elsewhere: "80% of clients do not divulge . . . they just say they voted if that—they don't want the harassing phone calls either . . . . and [it's] too much to keep a relationship with thousands of advisors, hedge funds, and custodians especially in this environment."

57.     On or about January 22, 2010, Bennett supplied SEDLAK with confidential information about the number of shares two of the Proxy Advisory Firm's clients held in the Wisconsin-based conglomerate, and how they had voted those shares.

58.     On or about March 19, 2010, SEDLAK purchased two tickets to an opening day baseball game between the New York Yankees and the Boston Red Sox at Fenway Park in Boston, at a cost of more than $800. SEDLAK provided the tickets to Bennett.

59.     On SEDLAK's expense report, the tickets were described as a gift for Bennett. In or about and between May 2010 and June 2010, at least part of the cost of the tickets was split between at least two clients of ACKERLY and GARSKE—a Bermuda-based insurance and reinsurance company and a Wisconsin-based provider of workforce solutions—and described, alternately, as travel expenses and "market intelligence."

60.     On or about February 28, 2011, Bennett sent an email from his personal email account to SEDLAK's email account at the Proxy Solicitation Firm requesting two tickets, at a cost of $219 each, for Bennett and his wife to attend a live music concert in Sonoma, California, on June 11, 2011. Thereafter, at SEDLAK's request, GARSKE purchased the tickets in his own name, and requested to change the pickup name for the tickets to Bennett and his spouse. Bennett ultimately attended the concert using the tickets purchased by GARSKE.

61.     This ticket expense was falsely reported on GARSKE's expense report as a gift to a client of the Proxy Solicitation Firm.

*The Major Department Store Company*

62.     On or about May 17, 2011, three days before the annual shareholder meeting of a major Cincinnati-based chain of department stores (the "major department store company"), SEDLAK sent an email from his email account at the Proxy Solicitation Firm to Bennett's personal email in which he listed several institutional shareholders of the major department store company and inquired "how many & how voted" on several pending shareholder propositions.

Bennett responded the same day by providing confidential information about how certain of the Proxy Advisory Firm's clients had voted on the proposals.

63.     On or about May 25, 2011, five days after the annual meeting, SEDLAK sent another request to Bennett in which he inquired "how many & how voted" on one of the shareholder proposals voted on at the meeting, concerning executive compensation.  The next day, SEDLAK followed up with Bennett twice, stating, "Please check on this one as soon as you can—need this by the morning for a call," and "Please check on this one as soon as you can."

64.     On or about May 26, 2011, HAYNES sent an email to SEDLAK and another employee of the Proxy Solicitation Firm asking whether there had been "any progress" on obtaining the additional voting information he sought.  SEDLAK responded:  "I thought I would have heard from my guy at [the Proxy Advisory Firm] last night but I am still waiting for his response.  I am sending him a reminder bc I haven't seen it yet.  Not certain if [the other employee of the Proxy Solicitation Firm] has anything additional as of yet."  The other employee responded that he did not have additional information because a particular Atlanta-based investment management company "won't disclose that information."

65.     The next day, HAYNES sent an email to SEDLAK and the other employee asking "Anything yet?"  SEDLAK responded "I have not heard . . . he took 2 days off . . . I asked him to at least look at 2 specific hits I sent him via text since he is on vacation.  I also told him I will send him some tickets next month somehow to prod him a little more even though he is away from work bc he does have his laptop.  I also sent a text to someone in Oklahoma ([the Proxy Advisory Firm] operations]) to ask them to check out those hits for me if they can.  In the meantime, I am going to leave a message for [the Atlanta-based investment management

company] to see if I could get anywhere with that as well. I am hoping he catches up to all of his requests this weekend despite it being a holiday."

66.     On or about May 30, 2011, Bennett provided SEDLAK information on how several clients of the Proxy Solicitation Firm had voted on the executive compensation proposal, including the Atlanta-based investment management company. The following day, HAYNES notified the major department store company that the Atlanta-based investment management company had voted against the proposal.

*The Major Discount Retailer*

67.     On or about June 1, 2011—one week before the annual shareholder meeting of a major Minnesota-based discount retailer ("the major discount retailer")—HAYNES emailed the company as follows: "We are tracking the voting activity of your top 50 institutions on Directors with the highest against votes . . . the Incentive Plan, [say-on-pay] and shareholder proposals. As always, it is never an exact science but we have provided our best sense of which holders have currently voted and will update as we receive new information."

68.     Eight minutes after emailing the major discount retailer, HAYNES emailed SEDLAK: "Mike—please use your source for [the major discount retailer] ID on the attached proposals. Thx."

69.     On or about June 2, 2011, SEDLAK emailed Bennett a list of 18 institutional shareholders of the major discount retailer and inquired "how many and how voted" on multiple pending shareholder proposals. Bennett responded the following day with information on whether the shareholders had voted and, if so, how. SEDLAK forwarded the information to HAYNES, noting, "Just got these this morning." HAYNES responded, "thx."

70.     On or about June 3, 2011, Bennett emailed SEDLAK, "i'll probably be sending you something on Monday for sf giants game on thursday or friday. . . . but i'll give you a ring on it."

71.     On or about June 6, 2011, HAYNES emailed SEDLAK and another member of the Proxy Solicitation Group's ISG, noting "Need to know this am" whether one of two major Boston-based investment management companies had voted, and if so, whether they had voted against the reelection of a particular director of the major discount retailer.

72.     On or about June 7, 2011, SEDLAK emailed HAYNES and two other employees of the Proxy Solicitation Firm that "[m]y guy at [the Proxy Advisory Firm] confirmed for me last night that [one of the Boston-based investment management companies] is voting in favor of" the director.

73.     That same day, SEDLAK purchased two tickets to a baseball game in San Francisco, California, between the Cincinnati Reds and the San Francisco Giants. The game was scheduled for June 10, 2011, one day before the Sonoma, California concert for which GARSKE had previously purchased tickets in Bennett's name. SEDLAK provided the baseball tickets to Bennett.

*The European Pharmaceutical Company*

74.     On or about the afternoon of June 30, 2011—one day after the Proxy Advisory Firm recommended that its clients vote against the re-election of two members of the board of directors of a European pharmaceutical company ("the European pharmaceutical company")—SEDLAK sent an email from his email account at the Proxy Solicitation Firm to Bennett's personal email account inquiring "how many & how voted" on the two candidates. SEDLAK

wrote: "Please check on this as soon as you can—we have a call with them at 10am—and the cut-off is on Tuesday."

75.     Shortly after 8 am the following morning, Bennett responded by providing confidential information about how the Proxy Advisory Firm's clients had voted on the two candidates for the European pharmaceutical company's board. In his email to SEDLAK, Bennett wrote: "you owe me big time, over and over ……"

76.     On or about and between August 16, 2011 and October 12, 2011, SEDLAK purchased tickets for Bennett and a guest to attend a baseball game between the Tampa Bay Rays and the Boston Red Sox at Fenway Park, in Boston, a college football game between the University of Missouri Tigers and the University of Oklahoma Sooners, in Norman, Oklahoma, and a football game between the Dallas Cowboys and the New England Patriots in Foxboro, Massachusetts.

77.     On or about September 20, 2011, GARSKE emailed SEDLAK to inquire whether he had "any news" about three companies, including a Massachusetts-based pharmaceutical company and a Colorado-based pharmaceutical company, which had previously announced plans to merge. Shareholders of the two companies were scheduled to vote on the merger in or about October 2011.

78.     On or about the same day, SEDLAK emailed GARSKE, among other things, as follows: "i could certainly inquire with [the Proxy Advisory Firm] on both shortly. . . . i am just trying to be patient for the ballots to populate the [Proxy Advisory Firm] system in both cases as you know." In that email, SEDLAK continued as follows:

> BTW . . . [a Boston-based custodial bank] was easy before . . .
> meaning 2 months ago but they recently installed a system to track
> all printouts on securities so I now have to get my breakdown via
> texting only so nothing could get traced so I had to live with
> something (which is usually the bulk of it) is being better than
> nothing . . . we talked about this a month ago and you understood
> the security issues. . . ."

On or about the same day, GARSKE responded: "Yep."

79.     On or about October 4, 2011, SEDLAK emailed GARSKE, "I have a charge for

August 17th (Tampa Bay vs. Red Sox) for $788 for [the Proxy Advisory Firm].  Can I have a

name of someone to bill this to please?"  GARSKE responded by providing the name of the

Massachusetts -based pharmaceutical company.

80.     On or about October 10, 2011, SEDLAK emailed GOTTCENT, noting: "info

does not come cheap. . . . for each request, people want tickets, dinner or whatever and that is not

always easy to find someone to bill and most [account executives] are not forthcoming with

providing a client name. . . I understand we are public but when it comes down to prime time—

all people care about is getting the info and nothing else matters. . . ."

81.     In or about December 2011, after GARSKE had resigned from the Proxy

Solicitation Firm to join another proxy solicitation firm, the Proxy Solicitation Firm invoiced the

Massachusetts -based pharmaceutical company more than $1,700 for purported "courier

service[s]."  In reality, the charges were comprised of the cost of the tickets SEDLAK had

provided to Bennett to attend the Reds-Giants game in San Francisco and the Red Sox-Rays

game at Fenway Park, plus a 20 percent markup.

## Conclusion

82.     Based on my knowledge, training and experience and the facts set forth in this

affidavit, I have probable cause to believe and I do believe that the defendants, DONNA M.

ACKERLY, CHARLES W. GARSKE, also known as Chuck Garske, RICHARD J.

GOTTCENT, KEITH HAYNES, and MICHAEL SEDLAK, together with others known and

unknown, conspired to commit offenses against the United States, to wit, wire fraud and honest

services wire fraud, in violation of Title 18, United States Code, Section 371.

Sworn to under the pains and penalties of
perjury.

Kevin McCusker, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me July __11__, 2016

The Honorable Marianne B. Bowler
United States Magistrate Judge

22